567 So.2d 623 (1990)
STATE of Louisiana
v.
Brian DIETRICH.
No. 89 KA 1125.
Court of Appeal of Louisiana, First Circuit.
June 26, 1990.
Writ Denied November 9, 1990.
*625 Cheney Joseph, Dist. Atty. by Janis L. Kile, Asst. Dist. Atty., Baton Rouge, for State.
Kathryn M. Flynn, Baton Rouge, for defendant.
Before CARTER, SAVOIE and ALFORD, JJ.
CARTER, Judge.
Brian Dietrich was indicted by the East Baton Rouge Parish Grand Jury for second degree murder, in violation of LSA-R.S. 14:30.1. He entered the dual plea of not guilty and not guilty by reason of insanity. He was tried by a jury, which convicted him as charged. The court imposed the mandatory penalty of life imprisonment, without benefit of probation, parole, or suspension of sentence. Defendant appealed, urging ten assignments of error. Assignments of error one and eight were specifically abandoned.

FACTS
Defendant was charged with the stabbing death of Patrick Sonnier, the automobile parts manager of a K-Mart Store in Baton Rouge, Louisiana. The victim was killed in his apartment on March 17 or 18, 1987.
The autopsy revealed that the victim had been stabbed sixteen times with a knife blade approximately three-quarters of an inch wide and at least four inches long. Nine of the stab wounds were in the upper portion of the victim's back. He was also stabbed three times in the chest, puncturing both lungs and his heart. The victim's throat was stabbed four times. Two of those wounds severed his carotid artery and jugular vein, and one of the other wounds essentially decapitated him. The victim bled to death approximately twenty to forty seconds after the vein and artery were severed. The blood flow patterns indicated that he was already dead at the time the wounds to his chest and back were inflicted.
The victim's body was discovered by a co-worker, who went to his apartment to learn why the victim had not gone to work. He found the body inside the apartment and summoned assistance. The victim's apartment was in disarray, and his wallet was missing. Investigating officers recovered several beer cans from the apartment. The officers were able to lift a fingerprint from one of the cans.
The murder remained unsolved for several months. It was featured on Crimestoppers, a local television crime-discovery show, approximately three months later. After the broadcast, officers received information which led them to contact Jason Cancel; and he, in turn, provided the name "Brian" and an address where Brian could be located. The investigating officers obtained defendant's full name from his employer. His fingerprints were compared to *626 the print lifted from the beer can recovered from the victim's apartment, and the prints matched.
At the time the fingerprint match was obtained, defendant was in the parish jail, having been arrested for an unrelated offense. He was taken from the jail and arrested for second-degree murder. After the investigating officers advised him of his constitutional rights, defendant asked for another officer, Greg Phares, by name. Officer Phares went to the interrogation room to speak to defendant. Defendant initially denied involvement in the offense. He later stated that he killed the victim because the victim made homosexual advances toward him and threatened him with a knife.

SUFFICIENCY OF THE EVIDENCE[1]
By assignments of error nine and ten, defendant contends that the evidence was insufficient to sustain the verdict. In assignment of error number nine, defendant submits that the trial court erred by denying his motion for a new trial. In assignment of error number ten, defendant argues that the court erred by denying his motion for a post-verdict judgment of acquittal.
Defendant admits that he stabbed the victim. He claims, however, that the evidence established that he stabbed the victim in self-defense. Alternatively, he claims that the evidence established that he killed the victim under provocation, and, therefore, he was guilty only of manslaughter.
When a defendant claims self-defense in a homicide case, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. State v. Garcia, 483 So.2d 953 (La.1986). A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger...." LSA-R.S. 14:20(1).
Defendant argues that the state failed to adduce any evidence to rebut his claim of self-defense. He submits that he established the killing was committed in self-defense through the testimony of Jason Cancel and Barbara Whitmore, relating the statements defendant made to each of them after the murder; the photographs of the scene showing that a struggle took place before the stabbing; and the testimony of Dr. Suarez that the victim was stabbed from front to back.
We find no merit to defendant's contentions that he established the killing took place in self-defense through the photographs of the crime scene and the testimony of the coroner. In his statement to Greg Phares, defendant admitted that he rearranged the room and that he also disposed of evidence which might link him to the scene. Further, although Dr. Suarez testified that the wounds showed defendant was stabbed from the front, the frontal wounds certainly are not indicative of an exclusively defensive encounter. Moreover, Dr. Suarez testified that he found no wounds of a defensive nature on the victim's body, indicating that the victim was either "highly intoxicated, subdued by any kind of medicine, alcohol, he was asleep or he was surprised by the attack."
Jason Cancel testified that, on the night of the murder, he asked defendant to drive Barbara Whitmore, his girlfriend, to her home in Baker. Defendant agreed to do so, and defendant, Whitmore, Cancel, and two unidentified male companions left in defendant's car. Defendant drove, and as he drove, he played with a large buck knife.
Defendant dropped off Ms. Whitmore at her home and took the unidentified males to an area near the Louisiana State University campus. He and Cancel went to a nearby lounge to drink beer and play pool. Defendant told Cancel that he wanted to take a walk and left the lounge. He returned approximately thirty-five minutes *627 later, and he told Cancel that the victim had asked them to come to his apartment for a few drinks.
Defendant and Cancel arrived at the victim's apartment at approximately midnight, and the victim opened the door dressed in the bottom part of a pair of long underwear and a robe. He wore several rings on his hands.
The three men drank all of the beer in the victim's apartment. The victim offered to buy more beer; however, Cancel volunteered to go. The victim had offered Cancel a $20.00 bill; but Cancel took money from defendant, and the victim returned the bill to the pocket of his robe. Cancel drove defendant's car.
Cancel was unfamiliar with the area and lost his way, and, after he eventually found an open convenience store, he was unable to make the purchase because it was after 2:00 a.m. After playing video games in the store, he returned to the victim's apartment. He saw defendant on the stairway of the apartment. Defendant told him he had explained to the victim that Cancel would be unable to buy beer and left.
The following day, Cancel saw a television news report featuring the victim's murder. When defendant came by his residence a few days later, he confronted defendant. Defendant told Cancel that he "snapped" when the victim made a homosexual pass at him.
On redirect examination, Cancel testified that defendant claimed the victim had initially approached him for sexual relations while Cancel was in the bathroom of the victim's apartment. When Cancel asked him why he had remained at the apartment after the approach, defendant explained only that "[w]ell, I gave you a suspicious look."
Barbara Whitmore testified that, after the murder, defendant twice called the school where she worked, asking for Cancel, a student there. During the first call, defendant told her that he killed the victim because the victim "wanted him to do things with him." Defendant did not explain what type of activity the victim sought.
We find no merit to defendant's claim that he established the killing took place in self-defense through the testimony of Cancel and Whitmore. Neither of these witnesses related that defendant claimed to have been physically threatened by the victim. Even if the victim had approached defendant for sexual favors, in order to justify a killing the defendant must believe "that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." Defendant's statements to Cancel and Whitmore do not reveal a belief that he believed he was in danger and that it was necessary to kill the victim to save himself.
Greg Phares also related the statement he took from defendant. In that statement, defendant claimed that the victim initially offered him money for voluntary sexual relations, and, after he refused, the victim threatened him with a knife. Defendant admitted that he knocked the victim to the ground, causing the knife to fall from the victim's grasp, and that he stabbed the victim as he tried to stand up. Therefore, although defendant claimed in that statement that he was initially threatened by the victim, he also stated he later gained an advantage and killed the victim at a time when the victim was essentially defenseless.
For appellate purposes, the standard of review of a claim of self-defense is whether or not a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could find beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Matthews, 464 So.2d 298 (La.1985). Herein, although defendant contended that he stabbed the victim in response to either the victim's request for sexual relations or his threat to force such relations, he did not claim that he killed the victim because he felt he was in imminent danger of death or of receiving great bodily injury and that the killing was necessary to save himself. Accordingly, we find that a rational trier of fact could have found beyond a reasonable *628 doubt that the killing was not committed in self-defense.
Defendant further argues that the evidence established that he committed the killing under the provocation of the victim's sexual advances and, therefore, the verdict should be reduced to a conviction of manslaughter. The "heat of passion" manslaughter provision [LSA-R.S. 14:31(1)] has all of the elements of second degree murder, but in addition has the mitigating circumstance of sudden passion. State v. Washington, 484 So.2d 946 (La.App. 1st Cir.1986). Having found the elements of second degree murder, the jury then had to determine whether or not the circumstances indicated that the crime was actually manslaughter.
Provocation may reduce a homicide to manslaughter if "the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection." LSA-R.S. 14:31(1). Nevertheless, "[p]rovocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed...." LSA-R.S. 14:31(1). "Heat of blood" and "sudden passion" are not elements of the offense of manslaughter but are mitigating circumstances which may reduce the grade of a homicide. State v. Tompkins, 403 So.2d 644 (La.1981). Because the question of provocation, including whether or not the offender's blood had actually cooled or whether or not the average person's blood would have cooled, is one of fact, it is for the jury to determine. State v. Washington, supra.
Although defendant claims the provocation was caused by the victim's homosexual advances, Jason Cancel testified that defendant told him the victim initially requested sexual favors before Cancel left to buy more beer, and defendant did not react at that time, nor did he leave the apartment when he had the opportunity to do so. Accordingly, the jury could well have found no merit to defendant's claim that he was so provoked by the victim's request for sexual relations that he killed the victim in sudden passion.
Herein, although defendant claimed that the victim threatened him with a knife, the state established that defendant carried a knife a few hours before the victim's murder. The description of that knife matched the description of the instrument which inflicted the wounds, as well as the description of the knife which defendant admitted he disposed of after the murder. Despite defendant's assertion that he obtained the knife from the victim during the fray, the jurors could readily have rejected that claim and concluded that defendant attacked the victim with his knife after Cancel left. Such a conclusion was further bolstered by the testimony of Dr. Suarez that the victim's body bore no defensive wounds. Further, the state presented evidence that jewelry worn by the victim when Cancel left was missing when the body was discovered, and money which had been seen in his pocket also was missing. Defendant admitted that he rearranged the apartment and that he wiped away his fingerprints. When arrested for the offense, defendant stated with self-assurance that "[y]ou don't have anything on me." When advised that his bloody fingerprint had been lifted from the apartment, defendant responded only that "[y]ou must have gotten it from the sliding glass door." The jury could well have inferred from the circumstances of the offense that defendant murdered the victim in cold blood.
We find, therefore, that any rational trier of fact could have found that the state proved beyond a reasonable doubt that the killing did not take place in self-defense. Further, the jury obviously concluded that the offense was not committed in heat of passion, and that conclusion was amply supported by the record. Accordingly, we find no merit to these assignments of error.

DENIAL OF MOTION TO SUPPRESS
By assignment of error number two, defendant submits that the trial court erred by denying his motion to suppress the statement he made to Officer Phares. *629 He claims that the state failed to prove that the statement was made voluntarily. He further claims the statement was induced by Officer Phares by means of defendant's relationship with him.
Defendant did not testify at the hearing on the motion to suppress the confession. The state presented the testimony of Detective Crawford Wheeler and Officer Greg Phares. Detective Wheeler testified that he arrested defendant for the murder and advised him of his rights. Detective Wheeler related that "[h]e first said to me that I didn't have anything on him." After Detective Wheeler told him that his fingerprints had been recovered from the murder scene, defendant told him, "I bet you got them off the sliding back door." Defendant then asked for Officer Phares.
Officer Phares testified that he joined defendant in the interrogation room after he was advised that defendant asked for him. He related that he had known defendant for approximately one year before the incident. He readvised defendant of his constitutional rights. Officer Phares then testified as follows:
I asked him if he was involved in the crime of which he was accused; and he said, no, he wasn't; and at that point, I told him that, as he knew, his bloody fingerprint had been found at the scene and that he had known me too long to lie to me like that; and I said, `I'm going to ask you again, are you involved?' And at that point, he said that he had killed a man and at this point [I] stopped him and advised him on waiver (sic) the same thing I had advised him just prior to that orally.
Officer Phares denied that any threats, promises, or inducements were made to obtain the statement. On cross-examination, he was asked if, by his statement "that he had known me too long to lie," he meant that he and defendant were friends, and he replied as follows:
I meant it that we knew each other, that he'dI had just faced him with what I would consider to be pretty overwhelming evidence that he was at the scene, a bloody fingerprint, and don't lie to me.
When asked to describe his relationship with defendant, Officer Phares testified that "we weren't on unfriendly terms." He related that his relationship with defendant was similar to others he developed with people he encountered during his detective work. The court subsequently questioned Officer Phares as follows:
Q All right. Mr. Monahan has indicated that you were friends with Mr. Dietrich and you indicated that you just weren't friends; you just felt that you had a relationship of some sort. Is that what you're talking about?
A Well, Your Honor, we weren't on unfriendly terms at all in
Q All right. Let me tell you what the dictionary definesall rightdefines friend: one attached to another by affection or esteem. Would you say that was your relations[hip]?
A No, sir.
Q All right. Then, number two: one that is not hostile.
A That'sthat would be correct, yes.
Q Okay. So you were a friend in that you were not hostile toward each other?
A That's correct.
Q All right. You never, at any time, indicated to him that he would receive any lenience or anything would go light on him because he talked to you about the case? You just told him to shoot straight with you?
A That's correct. Yes, sir.
In his brief, defendant claims that "[t]he testimony of Phares shows that he intended to use this relationship in order to induce appellant to make a statement." Relying solely on Officer Phares's testimony to the effect that "we had known each other too long for him to lie to me," defendant contends that "Phares' reliance on their past relationship constitutes an improper inducement."
Initially, we note that defendant's argument totally ignores the uncontroverted testimony of Officer Phares that he did not have an especially remarkable relationship *630 with defendant. Moreover, Officer Phares testified that he did not induce the statement and that no promises were made to defendant for his statement.
The state has the burden of proving the admissibility of a confession. LSA-C.Cr.P. art. 703(D). The state must show that the confession was free and voluntary and not induced by threats, promises or coercion. LSA-R.S. 15:451. When a confession is taken from a person in custody, the state must also show that the person giving the confession was advised of his constitutional rights and that he made an intelligent waiver of those rights. State v. Benoit, 440 So.2d 129 (La.1983). If the defendant alleges police misconduct in eliciting a confession, it is incumbent upon the state to rebut these allegations specifically. State v. Welch, 448 So.2d 705 (La.App. 1st Cir.1984), writ denied, 450 So.2d 952 (La.1984). The factual conclusions of a district court on the admissibility of a confession will not be overturned on appeal unless they are not supported by the evidence. State v. Boudreaux, 471 So.2d 1021 (La.App. 1st Cir.1985).
Both Detective Wheeler and Officer Phares testified that defendant was advised of his constitutional rights. After he admitted that he was involved in the killing but before he related the details of the offense, defendant signed a written advice of rights form. Defendant indicated that he understood his rights and that he wanted to make a statement to Officer Phares. Accordingly, we find that the state met its burden of proving that defendant was advised of and waived his rights when he elected to speak to Officer Phares.
We further find that the state specifically rebutted defendant's claim that the statement was involuntary because it was improperly induced by means of the relationship between Officer Phares and defendant. Officer Phares met with defendant because defendant asked for him. His testimony indicates that his relationship with defendant was not that of a close and trusted friend. Compare State v. Lollis, 492 So.2d 200 (La.App. 4th Cir.1986), writ denied, 494 So.2d 1179 (La.1986). He denied that he induced defendant to make the statement or that he promised leniency in order to obtain it. No testimony was presented to controvert the testimony of Officer Phares, and the trial court obviously found that his testimony was credible. Therefore, we find that the state met its burden of specifically rebutting defendant's claim of improper conduct. Accordingly, we find no merit to this assignment of error.

DENIAL OF MOTION TO COMPEL
By assignments of error three and four, defendant submits that the trial court erred by denying his motion to compel production of physical evidence. Defendant sought to obtain the victim's personal telephone directory, which had been collected from his apartment during the murder investigation.
As previously noted, defendant claimed that he killed the victim because the victim had made homosexual advances toward him. He filed a motion to compel production of the directory, contending that the book contained exculpatory evidence which the state was required to produce under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The court denied the motion. After the hearing on defendant's motion to suppress the confession, defendant filed a second motion to compel production of the directory, alleging that evidence was presented at that hearing to establish sufficiently that the victim made a hostile act toward defendant. At a hearing on this motion, defense counsel argued that the book would produce exculpatory evidence because defendant could call the people whose names were in the book and locate witnesses who would testify that the victim was a violent person. The court denied the motion, finding that no relevance had been shown to support that claim.
Defendant now argues that the evidence was material for two reasons: (1) to establish that the victim was a dangerous person and may have attempted sexual relations with young boys other than defendant; and *631 (2) that someone else may have entered the victim's apartment after defendant.
In Brady v. Maryland, supra, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment. Citing United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), defendant submits that the test for determining the materiality of suppressed evidence is whether or not the evidence "might have affected the outcome of the trial." However, that standard for determining materiality was specifically abrogated by the Court in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), which defines materiality as follows:
The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.
[105 S.Ct. at 3383].
This standard was adopted by the Louisiana Supreme Court in State v. Rosiere, 488 So.2d 965 (La.1986).
We find no error in the court's ruling. In light of defendant's confession that he stabbed the victim repeatedly, his claim that the book was necessary to determine if someone else entered the victim's apartment after defendant left is clearly immaterial. We further find defendant's claim that the victim might have attempted sexual relations with men other than defendant is also immaterial and irrelevant. At the hearing on defendant's motion to compel, he claimed that he would have been able to discover witnesses to the victim's violent nature through use of this directory. This claim is based entirely on defendant's unsupported conclusions. Defendant characterized the directory as the victim's "little black book" which contained the names and addresses of the victim's sexual contacts, inferring that these people would establish the victim's violent nature by revealing that he participated in sadomasochistic sexual relations. However, defendant did not present evidence of the victim's sexual preferences at that hearing. Moreover, defendant presented no basis to support his claim that it was a directory of sexual contacts, rather than a simple address book.
Initially, we note that defendant failed to advise the trial court of the specific basis upon which his claim rested. Further, even if the victim engaged in sadomasochistic sexual encounters, this court cannot make the factual determination upon which this claim may be based. Finally, if defendant's motion was based on a claim that the victim kept a directory of forced sexual encounters, that argument appears to be based on conjecture.
The mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial does not establish "materiality" in the constitutional sense; the "reasonable probability" of a different outcome is required. See United States v. Bagley, supra. On defendant's conjecture alone, we cannot conclude that the production of the victim's address book would have led to a different trial result.
Defendant further claims that the court erred by failing to compel production of the directory under the discovery provisions of LSA-C.Cr.P. art. 716, et seq. LSA-C.Cr.P. art. 718 provides for the discovery of documentary evidence, in pertinent part, as follows:
Subject to the limitation of Article 723, on motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect, copy, examine, test scientifically, photograph, or otherwise reproduce books, papers, documents, photographs, tangible objects, buildings, places, or copies or portions thereof, which are within the possession, custody, or control of the state, and which:
(1) are favorable to the defendant and which are material and relevant to the issue of guilt or punishment, or

*632 (2) are intended for use by the state as evidence at the trial, or
(3) were obtained from or belong to the defendant.
Defendant claims that the directory was discoverable because it contained information which was material and relevant to the issue of guilt. However, the court obviously concluded that defendant's claim that the directory might contain information that could lead to the discovery of the victim's sexual contacts was insufficiently established and unlikely to lead to the discovery of favorable evidence. We agree. The purpose of the discovery articles is to eliminate unwarranted prejudice which could arise from surprise evidence. State v. Toomer, 395 So.2d 1320 (La.1981). LSA-C.Cr.P. art. 718 does not authorize a "fishing expedition" by the defense to obtain this type of evidence. See, e.g., State v. Loyd, 425 So.2d 710 (La.1982), affirmed, 459 So.2d 498 (La.1984); State v. Vampran, 491 So.2d 1356 (La.App. 1st Cir. 1986), writ denied, 496 So.2d 347 (La.1986). Accordingly, we find no merit to this assignment of error.

EXCLUSION OF EVIDENCE
By assignment of error number five, defendant submits that the trial court erred by granting the state's motion in limine, thereby excluding defendant's evidence relative to the "homosexual anxiety panic syndrome." He claims he was entitled to present expert testimony relating to his mental defect because he entered the dual plea of not guilty and not guilty by reason of insanity.
After defendant entered his insanity plea, the court appointed a commission to determine his mental capacity to proceed. Both of the members of the sanity commission and defendant's own psychiatrist were questioned about defendant's sanity at the time of the offense, and each witness testified he believed that defendant knew the difference between right and wrong at the time the murder was committed. At the conclusion of the hearing, the court found that defendant was competent to proceed. The court further noted that the issue of defendant's sanity was an issue within the province of the jury.
During the voir dire examination, defendant questioned the potential jury members about their understanding of the "homosexual anxiety panic syndrome." Later, during his opening address, defense counsel apparently advised the jurors that he entered the plea of not guilty by reason of insanity so that he could introduce testimony of defendant's state of mind at the time of the offense.[2] Thereafter, the state filed a motion to exclude evidence of the "homosexual anxiety panic syndrome" as it related to defendant's state of mind, essentially arguing that defendant had admitted his sanity was not a legitimate issue. During argument on that motion, defense counsel agreed that the state could limit defendant's expert witness's testimony concerning the concept of the homosexual panic syndrome, but that he wished to offer the testimony as evidence of defendant's mental condition and state of mind. After argument, the court noted that defense counsel's opening remarks implied that sanity was not truly at issue and granted the motion, reserving defendant's right to reargue the matter at the time of the defense psychiatrist's testimony.
During the trial, defendant presented the testimony of his psychiatrist, Dr. Krishna Yalamanchili. Dr. Yalamanchili testified that he examined defendant twice and that defendant had related a history of the offense to him, which included his claim that the victim offered him $50.00 in return for sexual favors and threatened him with a knife when he refused. Dr. Yalamanchili also related his belief that, at the time of the offense, defendant was aware of the distinction between right and wrong. He further testified as follows:
Brian was so panicked and he could not do anything except to (sic) defend himself by grabbingor according to my report, he got hold of the knife and *633 stabbed the other man five times for self defense.
Defendant does not now claim that the court's ruling prevented him from presenting evidence relative to his claim of self defense. Rather, he contends the ruling was tantamount to a denial of his right to present a defense because, since he entered the insanity plea, he must be permitted the opportunity to present evidence to support it. Specifically, defendant claims it was inappropriate for the court to determine that the evidence would "fall short of the McNaughten (sic) standard" and therefore prevent the defense from placing evidence concerning the "homosexual anxiety panic syndrome" before the jury.
A defendant is presumed sane and responsible for his actions. LSA-R.S. 15:432. LSA-R.S. 14:14 provides for the defense of insanity, as follows:
If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility.
The State of Louisiana does not recognize the doctrine of diminished responsibility. State v. Burton, 464 So.2d 421 (La.App. 1st Cir.1985), writ denied, 468 So.2d 570 (La.1985). Under the statutory definition set forth in LSA-R.S. 14:14, a mental defect short of legal insanity cannot serve to negate specific intent and reduce the degree of the crime. State v. Andrews, 369 So.2d 1049 (La.1979).
We find no error in the court's ruling excluding evidence of the "homosexual anxiety panic syndrome." Defendant was apparently of the opinion that the evidence was relevant to mitigate a finding of specific intent by proving his panicked state of mind. In light of his own expert's testimony both at the sanity hearing and at trial, it appears that defendant was willing to present expert testimony that he was able to distinguish between right and wrong at the time of the offense; however, because of his state of mind, he believed he was justified in killing the victim because the victim threatened him. Evidence of defendant's mental condition was presented to the jury for use only in its determination of whether or not he was insane at the time of the offense and was not relevant to a determination of whether or not he had the specific intent to kill or inflict great bodily harm. See State v. Pravata, 522 So.2d 606 (La.App. 1st Cir.1988), writ denied, 531 So.2d 261 (La.1988). Only legal insanity, that is, the inability to distinguish between right and wrong at the time of the offense, can negate specific intent or reduce the degree of the crime, and the expert witness through whom the testimony was to be presented freely admitted that defendant could distinguish between right and wrong at the time of the offense.
We find, therefore, that the evidence defendant sought to introduce was not relevant to a material issue at trial because it did not relate to defendant's ability to distinguish between right and wrong. Accordingly, we find no error in the court's ruling granting the state's motion in limine.

OTHER CRIMES EVIDENCE
By assignment of error number six, defendant submits that the trial court erred by denying his motion for a mistrial based on the introduction of other crimes evidence. He claims that he was prejudiced because the court was permitted to infer from a remark made by a state witness that defendant was involved in crimes other than the offense for which he was on trial.
Defendant was arrested for this offense while he was in jail awaiting charges on an unrelated matter. He filed a motion in limine, urging that the state should be prohibited from introducing evidence that defendant was brought from the jail to be arrested on these charges. The court granted the motion. During the trial, Detective Crawford Wheeler testified that he arrested defendant and read him his rights. The following exchange then occurred between the state and the witness:

*634 Q To the best of your recollection, what, if anything did he tell you?
A To the best of my recollection, after I gave him his rights he said, you don't have anything on me. I replied, I have your fingerprints. He then said, I bet you got them off the sliding glass door. I made no answer.
Q Is that all he told you?
A As I was about to take him back to the jail he said, I want to see Greg Phares.
Q Had you arrested him at that time?
A Yes, sir.
Defendant immediately moved for a mistrial and requested a hearing out of the presence of the jury. He complained that Detective Wheeler's remark that he was "about to take him back to the jail" implied that defendant was in jail when he was arrested. He argued that he was entitled to a mistrial because the state introduced inadmissible prejudicial evidence and because the state violated the court's order on his motion in limine, prohibiting the state from introducing this evidence.
LSA-C.Cr.P. art. 770(2) provides for a mandatory mistrial when a remark is made by the judge, the district attorney, or a court official within the hearing of the jury and such remark refers to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible. LSA-C.Cr.P. art. 771 provides for a discretionary mistrial, as follows:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
* * * * * *
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
Mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to the defendant sufficient to deprive him of a fair trial. State v. Edwards, 420 So.2d 663 (La.1982). When considering an alleged reference to other crimes evidence, unless a mistrial is mandated under Article 770, the trial court is granted discretion to determine whether a fair trial is not possible or whether an admonition is sufficient to assure a fair trial. The trial court's ruling is not to be disturbed on review absent an abuse of discretion. See State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983).
We find no abuse of discretion herein. In order to trigger the need for an admonition, the remark must refer to a crime alleged to have been committed by the defendant. Detective Wheeler's remark was not an unambiguous reference to a crime alleged to have been so committed. See State v. Hayes, 414 So.2d 717 (La.1982). Thus, it is doubtful that defendant was entitled to an admonition from the court, and we find no error in the court's ruling denying the motion for mistrial.
Further, we find no merit to defendant's claim that he was entitled to a mistrial because of the violation of the motion in limine. Before the jury was selected, defendant filed a motion to prohibit reference by the state's witnesses either to the place where defendant was arrested or to the fact that he was in jail when he was arrested. The court granted the motion. Although defendant now contends that Detective Wheeler's remark that he was interrupted as he was about to bring defendant "back" to the jail was a reference to the fact that he was in jail when he was arrested, we do not find his remark to be a direct reference to the location of defendant so as *635 to constitute a violation of the court's order.
After defendant moved for a mistrial, the state advised the court that it believed both Detective Wheeler and Officer Phares had been requested not to mention the location of defendant's arrest. Thereafter, the court found that the purpose of the motion was to protect the defendant's right to a fair trial and that it had the discretion to determine whether or not the accused was prejudiced by a violation. The court determined that it did not believe defendant could have been prejudiced by the remark.
Initially, we note that it is unlikely the jury actually inferred from Detective Wheeler's remark that defendant was in jail when he was arrested. Detective Wheeler had previously related that defendant had been arrested and that he had been told that his fingerprint had been found at the murder scene. Thus, the jurors could well have inferred that he had been taken to the jail and booked for this offense before he was questioned by Detective Wheeler. Further, especially considering the strength of the fingerprint evidence, the jurors probably expected that defendant would be taken to jail, and, in that context, the comment that he was being taken "back" to the jail could well have been taken as a figure of colloquial speech. Therefore, we find that Detective Wheeler's remark was not in violation of the court's ruling prohibiting the state from referring to the location of defendant's arrest or the fact that he was in jail at the time of the arrest. Moreover, as the court noted, we find it unlikely that defendant was prejudiced by the remark. Accordingly, we find no abuse of discretion in the court's determination that this remark did not warrant the drastic remedy of mistrial.

STATE OF MIND
By assignment of error number seven, defendant submits that the trial court erred by overruling his objection to the state's question calling for hearsay evidence. The state claimed the evidence was offered to show the relationship that existed between defendant and the victim and how the victim felt about defendant. Defendant argued that the victim's state of mind and the relationship between defendant and the victim were not at issue or relevant to a fact at issue, and, therefore, the evidence was not admissible.
Defendant's objection concerned the testimony of Tammy McAlister, a friend of the victim. Ms. McAlister testified that she visited the victim at his home a few days before the murder. During her visit, the victim introduced her to defendant and Jason Cancel.
The state questioned Ms. McAlister regarding her knowledge of the victim's plans with the men, and defendant objected. The court conducted a hearing out of the presence of the jury, during which the witness testified that the victim had told her that the "blond-headed one" was going to come back and spend the night, and they were supposed to go fishing the next morning. She identified defendant as the "blond-headed one." Ms. McAlister testified that a few days later she asked defendant if they had gone fishing, and he replied that they had not gone because it was raining.
The court then found that the evidence was admissible and overruled the objection. The jury was returned to the courtroom, and the witness repeated the testimony.
Defendant claims the evidence was prejudicial because it permitted the jury to infer that he was aware that the victim was a homosexual before he and Jason Cancel went to the victim's apartment on the night of the murder, and, therefore, the victim's proposition to him would not have taken him by surprise. Although defendant does not specifically set forth the basis of this claim, we presume that it is based upon his belief that, presented with evidence that defendant previously had spent the night at the victim's apartment, the jurors would conclude that the victim's sexual proclivities were made known to him.
Defendant did not testify at trial. However, through the testimony of several witnesses, the jury was presented with defendant's claim that he stabbed the victim *636 because the victim made sexual advances toward him.
Jason Cancel testified that he learned of the victim's murder through television news coverage. When Cancel confronted defendant a few days later, defendant cried and told Cancel his mind "clicked" when the victim asked him to have sexual relations and defendant stabbed the victim once with his knife.
Officer Greg Phares testified that defendant told him the victim initially requested a sexual encounter. After defendant refused, the victim threatened him with a knife and attempted to force relations with defendant. Defendant hit the victim with his fists, knocking the victim to the ground and forcing the knife from the victim's reach. Defendant then picked up the knife, stabbed him in the chest, cut his throat, stabbed him in the back, kicked him in the jaw, eradicated the fingerprints from the apartment, and left.
Dr. Krishna Yalamanchili, who testified as an expert witness on defendant's behalf, obtained a medical history from defendant in which defendant claimed that the victim had offered him $50.00 for sexual favors, and, when he refused, the victim threatened to kill him with a knife. Defendant further related that he was so panicked by the encounter that he grabbed the knife and stabbed the victim five times in self-defense.
Hearsay is "testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of the matters asserted therein, and thus resting for its value upon the credibility of the out of court asserter." State v. Martin, 458 So.2d 454 (La.1984). Hearsay evidence is generally inadmissible. See LSA-R.S. 15:434. Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter who is not subject to cross-examination and other safeguards of reliability. State v. Martin, supra. However, the use of an out-of-court statement to prove the declarant's state of mind is a traditional exception to the hearsay rule. State v. Weedon, 342 So.2d 642 (La.1977).
Out-of-court statements offered to prove state of mind can be admissible either as a direct assertion of the declarant's state of mind or as a statement indirectly tending to establish the state of mind of the declarant. In State v. Martin, supra, the Court noted as follows:
If the statement only indirectly tends to prove a certain state of mind then it is not hearsay because the truth of the assertion and the credibility of the declarant are not relied upon. Rather, the fact that the statement was made, regardless of its truth, is relevant to show the speaker's knowledge, intent, or some other state of mind.
[458 So.2d at 460].
State of mind evidence is admissible only if the particular person's state of mind which is being shown is itself at issue or is relevant to prove a fact in issue. State v. Martin, supra.
LSA-R.S. 15:441 defines relevant evidence as follows:
Relevant evidence is that tending to show the commission of the offense and the intent, or tending to negative the commission of the offense and the intent.
Facts necessary to be known to explain a relevant fact, or which support an inference raised by such fact, are admissible.
LSA-R.S. 15:442 further provides as follows:
The relevancy of evidence must be determined by the purpose for which it is offered; and when evidence has been excluded when offered for one purpose, but admitted when offered for another, its effect must be restricted to the purpose for which admitted, but no one can be heard to establish a fact for one purpose and deny it for another.
Although defendant claims that neither the victim's state of mind nor the existence of this relationship were related to facts at issue, we find that defendant placed his relationship with the victim at issue through his claim that he was surprised *637 and panicked when the victim asked him for sexual favors. Thus, a fact at issue was whether or not an intimate relationship existed between the victim and defendant, and the statement was admissible as tending to establish that relationship and the victim's belief that defendant was a trusted friend. Therefore, evidence that defendant spent the night in the victim's home and planned an excursion with him was relevant because that information tends to establish that defendant was well-acquainted with the victim's character and may have known of his sexual preferences before the incident which defendant claimed panicked him and led to the victim's death. Accordingly, we find that the evidence was offered for a relevant purpose and was therefore admissible and that any prejudicial effect was outweighed by its probative value. Thus, we find no merit to this assignment of error.

PATENT ERROR
The record is devoid of evidence that the trial court waited the required twenty-four hours after defendant's motion for a new trial was denied before imposing sentence. See LSA-C.Cr.P. art. 873. Nor does the record indicate defendant waived that waiting period. Defendant does not argue or in any way show he was actually prejudiced by the failure of the trial court to observe the waiting period. Such failure on the part of the trial court is harmless error where defendant does not show actual prejudice. State v. Marshall, 479 So.2d 598, n. 1 (La.App. 1st Cir.1985).

CONCLUSION
For the above reasons, defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Ordinarily, this Court will treat the assignments of error in the order designated in the record. However, in order to avoid repetition of the facts of this offense and in the interest of clarity, we elect to treat the issue of the sufficiency of the evidence first.
[2] Defendant failed to designate for transcription the opening addresses of the attorneys. However, the trial court based its ruling excluding the evidence on defendant's opening address, noting that defendant claimed the sanity plea was advanced for this reason.