601 So.2d 783 (1992)
STATE of Louisiana
v.
Paul MAYHO.
No. 91-KA-1144.
Court of Appeal of Louisiana, Fourth Circuit.
May 28, 1992.
Writ Denied October 9, 1992.
*785 Harry F. Connick, Dist. Atty., Jack Peebles, Asst. Dist. Atty., New Orleans, for appellee.
M. Craig Colwart, Orleans Indigent Defender Program, New Orleans, for appellant.
Before LOBRANO, WARD and ARMSTRONG, JJ.
LOBRANO, Judge.
Defendant, Paul Mayho, was indicted on October 5, 1989 for the second degree murder of Marvin Mitchell, a violation of Louisiana Revised Statute 14:30.1.
Defendant was arraigned on May 30, 1990 and pled not guilty. On March 6, 1991, following a three day trial, defendant was found guilty as charged by a twelve member jury. On March 22, 1991, defendant was sentenced to life imprisonment without parole, probation or suspension of sentence.

FACTS:
In the early evening of July 12, 1989, defendant drove Imprecina Wilson, also known as "Cina", to the home of Marvin Mitchell located in the 5900 block of Airway Street in eastern New Orleans. Defendant was driving a black Chevrolet Spectra belonging to his girlfriend, June Woodard. Imprecina Wilson was Marvin Mitchell's ex-girlfriend and the mother of their two year old son. Wilson went to Mitchell's home to pick up the child. Also living in the home were Marvin Mitchell's mother, Gloria Taylor, his brother, Deljuane Mitchell, his two sisters, Shandra and Katara, various nieces and nephews and his aunt and uncle.
According to the State's witnesses, Wilson entered the home without knocking and began a discussion with Marvin, the subject of which is unknown. The discussion became heated, and Deljuane and one of his sisters went upstairs to summon their mother who was asleep. Within minutes Mrs. Taylor came downstairs and began arguing with Wilson. During the argument, Taylor repeatedly asked Wilson to leave. Wilson kept looking at her watch, asking Marvin to step outside and peering through the front door which was slightly ajar. Mrs. Taylor became suspicious of Wilson's behavior, jerked the door open, looked outside and saw a black car parked across the entrance to her driveway. Standing on the driver's side of the car was defendant. His arms were stretched over the roof of the car and he was pointing a gun at the door. When defendant saw Mrs. Taylor, he began yelling, "I'm gonna kill all you M.F., I'm gonna kill all you M.F." Wilson grabbed her child and ran out of the house circling around a tree to avoid defendant's line of fire. Mrs. Taylor then slammed the front door and told everyone to get down. Looking out of the window, Mrs. Taylor saw defendant and Wilson drive away. However, approximately one block away, the car stopped and began backing up towards the house. Mrs. Taylor told everyone to stay inside. She then walked outside to ask defendant to leave them alone. When defendant stopped and exited the car, he was holding a gun. He began cursing Taylor and placed the gun to her head. A neighbor, observing what was happening, ran to Taylor's house to warn her family. Upon hearing that defendant was threatening their mother, Marvin, Deljuane, Shandra and Katara began running toward defendant and Taylor. None were armed. Defendant began aiming and looking through a round device on the top of his gun which Mrs. Taylor described as "some kind of little round thing" with a "red light" or "red dot" on it. As he aimed the device at Taylor's children, he kept yelling "Come on, M.F. Just a little closer, M.F.... Right there, M.F." As defendant was yelling, a red light was seen by several witnesses, including Deljuane and Shandra, flash across a mailbox and Deljuane's chest onto Marvin Mitchell's forehead. Defendant then fired his weapon, striking Marvin above the right eye. Defendant then returned to his car and drove from the scene. *786 Deljuane and a neighbor chased the car but lost it on Chef Menteur Highway. Marvin Mitchell was transported to the hospital where he later died. Several days following the shooting, defendant surrendered to police claiming he shot Mitchell in self-defense.
June Woodward, defendant's girlfriend, was called by the State. Woodward testified that she loaned defendant her car the day of the shooting. When he returned the car to her, he told her that Imprecina Wilson's boyfriend had a gun and that he shot him in self defense. He asked that she tell the police that she was with him that night because "it would look better for him". She testified that she gave two statements to the police, the second being the truth that she was not with defendant the night of the shooting. She stated she gave the second truthful statement after she found defendant's gun in the glove compartment of her car.
Imprecina Wilson testified on behalf of defendant. She stated that she asked defendant to drive her to Marvin's house the day of the shooting to pick up her son. She told defendant to drop her off a block from the house because Marvin had previously threatened another friend who had driven her there. She testified that Marvin had been violent in the past and that she obtained a restraining order to protect herself. She stated that when she attempted to leave with her child, Marvin grabbed the child and would not let her leave. They then began to argue and Marvin struck her. Mrs. Taylor then came downstairs and Marvin ran outside. She stated that while she and Mrs. Taylor were talking, defendant called for her to leave. Marvin then yelled for his mother to hold her and Mrs. Taylor grabbed her arm. She broke free, grabbed her son and ran for the car. She, defendant and the child entered the car and began to drive away when Mrs. Taylor exited the house and began to walk toward the car. Defendant stopped, backed up and exited the car. As he was talking to Mrs. Taylor, her family came out of the house and began running toward him. Wilson stated that Marvin was carrying a gun. Defendant reached inside the car for his gun and shot Marvin.
On cross-examination, Wilson admitted originally telling police that Marvin was not armed. At trial, however, she insisted that he was armed at the time of the shooting.
Defendant testified on his own behalf. He stated that he shot Marvin Mitchell in self defense. He testified that he had been driving around with Wilson for several hours when she asked him to take her to Mitchell's house and insisted that he drop her off at the corner. He did as she requested. After waiting about fifteen minutes, he drove in the general direction she had gone in an attempt to find her. As he drove down Airway Street, a man, seated on a parked car, yelled something which he could not understand. He circled the block and eventually passed this same man who threw a water balloon at his car and ran inside a house. Defendant then removed his gun from the glove compartment and exited the car. At the same time, a woman in a robe exited the house and told him that this was a family affair and not to get involved. He looked up, saw Wilson attempt to leave the house only to be pulled back inside. The woman in the robe then went back inside the house and a man exited. The man walked to a parked car, took out a bag and re-entered the house. The woman in the robe exited the house again. Defendant stated he could see Wilson struggling with someone in the house. He called for her to come out. She finally broke free and ran to the car. Various members of Mitchell's family pursued. He heard someone yell, "throw me the bag". Then a woman came toward him. He stated that because she was not armed, he did not fear her. He turned and leaned inside the car to open the door for Wilson and her child. As he did so, he heard other people running toward him. He stated that at this point he began to fear for his safety because Wilson told him of Marvin Mitchell's violent behavior. He testified that when he looked back he saw several people running toward him and that the man wearing the flowered shirt [Marvin Mitchell] had a gun. He testified that he picked up his gun and *787 fired in their general direction striking Marvin Mitchell in the head. He then left the scene and later surrendered to police.
Defendant denied aiming the gun specifically at Mitchell; that the gun had a laser sight; or that he asked anyone to lie for him.
Defendant appeals his conviction and sentence asserting the following assignments of error:
1) The trial court erred in denying the defense motion for mistrial;
2) The trial court erred in qualifying Officer Russell Palmer as an expert in lasers and in allowing him to testify as an expert in lasers;
3) The trial court erred in not allowing the defense to present a witness to impeach the testimony of a state witness;
4) The State failed to present sufficient evidence to sustain the defendant's conviction as charged beyond a reasonable doubt.

ASSIGNMENT OF ERROR 1:
Defendant contends the trial court erred by denying his motion for a mistrial based upon the testimony of State's witness, Keesha Carter. Carter testified that she saw a red light hit her mailbox moments before the shooting. Carter was questioned as follows:
"Q. Did you call the police?
A. Yes.
Q. Did you go outside?
A. No, not until the police came.
Q. Were you scared?
A. Yes.
Q. Why were you scared?
A. Because I thought maybe because he knew where I stayed, I thought he was going to come back for me.
Q. Are you scared today?
A. Yes.
Q. Why are you scared today?
A. Because if he don't comebe convicted, I think he's
MR. GREENBAUM:
Objection, Your Honor.
THE WITNESS:
going to come back for me.
THE COURT:
Objection sustained.
MS. HARRISON:
Nothing further, Your Honor.
MR. GREENBAUM:
At this time, Your Honor, I'd like to make a motion outside the presence of the jury."
Defense counsel then moved for a mistrial asserting Carter's testimony was preplanned, highly prejudicial and asked only to inflame the jury. The State responded that the purpose of the questions were only to show that the witness was nervous and scared especially "in the context of a witness being murdered two days into the murder trial". Defense counsel countered that the jury could very well judge her nervousness by her demeanor. In denying the motion for a mistrial, the trial court stated:
"... we are getting pretty close and you seem superfluous on those questions. The first one probably was enough, and I tend to agree with Mr. Greenbaum that continuing on that line of questioning is really irrelevant and all it's going to do is prejudice the jury. But at this point in time, I don't think those two questions are going to be of such a prejudicial nature as to inflame they jury and prejudicial [sic] to Mr. Mayho."
The Court then offered to admonish the jury but defense counsel refused stating "I don't think admonishing the jury having heard that statement is going to cure the prejudice. I think the prejudice is done."
Defendant asserts that the above testimony of Keesha Carter clearly indicates the State deliberately elicited the improper remarks from their witness. As such, defendant argues, these remarks are imputable to the State and mandate a mistrial pursuant to Code of Criminal Procedure Article 770. In support of his argument, defendant cites State v. Madison, 345 So.2d 485 (La.1977); State v. Overton, 337 So.2d 1201 (La.1976) and State v. Boudreaux, 503 So.2d 27 (La.App. 1st Cir. 1986). We disagree.
*788 Louisiana Code of Criminal Procedure Article 770, provides in part:
"Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * * * * *
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

* * * * * *
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial." (emphasis added)
Our Supreme Court in Madison and Overton and the First Circuit in Boudreaux applied article 770 where the record clearly showed the prosecutor's questions were designed to elicit other crimes evidence from State witnesses. The facts of these cases are distinguishable from the instant case. Here, Carter testified that she was afraid because she feared defendant would retaliate if not convicted. While her testimony could be considered as a reference to a threat by defendant, there was no evidence that such a threat actually was made. In our opinion, it does not constitute a reference to other crimes and does not fall within the scope of Article 770.
Louisiana Code of Criminal Procedure Article 771 provides for the discretionary granting of a mistrial as follows:
"In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial." (emphasis added)
A mistrial is a drastic remedy which is only authorized when the defendant has suffered substantial prejudice. State v. Comeaux, 514 So.2d 84 (La.1987).
The trial court noted that although the prosecutor's questions to Carter were irrelevant, they were not "of such a prejudicial nature as to inflame the jury" and prejudice defendant. The trial court then asked defense counsel if he wanted the jury admonished. Defense counsel refused. No facts militate against the trial court's conclusion that an admonition would have been sufficient to prevent substantial prejudice to defendant. Defendant refused the admonition and cannot now complain.
This assignment of error is without merit.

ASSIGNMENT OF ERROR 2:
Defendant asserts the trial court erred when it qualified Officer Russell Palmer as an expert on lasers and allowed him to testify as to their use.
Witnesses to the shooting described a red "dot" or "light" emanate from defendant's gun, move toward Mitchell and land on his forehead seconds before he was shot. In suggesting that the "light" or "dot" came from a laser sight, the State qualified and tendered Officer Palmer as an expert only in "the purpose and use of a laser attachment to a firearm". The purpose in calling Officer Palmer was to explain *789 to the jury what a laser sight is and how it is used with a firearm. The court accepted Palmer as an expert "in the use of the laser".
Louisiana Code of Evidence Article 702[1] provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
In State v. Armstrong, 587 So.2d 168 (La.App. 4th Cir.1991), this Court stated:
"Although La.C.E. Art. 702 et seq. has generally relaxed heretofore stringent qualifications for expert witnesses, greatly facilitating the use of expert testimony, the trial court still retains broad discretion to decide if that testimony should be admitted particularly in jury trials." at p. 170.
In the instant case, Officer Palmer possessed "technical" knowledge in the use of lasers with firearms which is not generally possessed by the public at large. He testified that he has been a certified firearms instructors with the New Orleans Police Department for four years. In addition to his regular duties, he also teaches police officers how lasers are used with firearms. He testified that he attended two instructional sessions where the application of a laser to a firearm was shown. He stated that he has seen lasers used with firearms and that their use is common. He testified that if the New Orleans Police Department were to use laser sights, that he would be the instructor to teach the officers how to use them. During his testimony, Officer Palmer demonstrated the use of a laser attached to a gun by aiming the laser sight at the courtroom ceiling. At no time did Officer Palmer testify that defendant used a laser the night be shot Marvin Mitchell.
Thus, we find no error in the trial court's recognizing Palmer as an expert in the limited area of laser use with firearms to assist the jury in weighing the evidence.
This assignment of error is without merit.

ASSIGNMENT OF ERROR 3:
Defendant asserts the trial court erred by refusing to allow him to call his mother, Ninta Mayho, in order to impeach the credibility of Deljuane Mitchell. During the cross examination of Deljuane Mitchell, defense counsel asked if he had made derogatory or threatening remarks to Mrs. Mayho while they were in court for a pretrial hearing. Mitchell denied making such threats but admitted an assistant district attorney made him apologize to Mrs. Mayho. He insisted that when he went to apologize, Mrs. Mayho stated that he was not the person who threatened her.
The day following Deljuane's testimony, defense counsel sought to call Mrs. Mayho to impeach Deljuane's credibility by testifying to the alleged threats made by Deljuane toward her. The State objected on the grounds of relevancy stating:
"Of relevance, for one thing, Your Honor, and it's going to turn into a mini-trial as to what happened. There will be several other witnesses. I see no relevance whatsoever to the issue at hand."
The trial court then disallowed the testimony finding:
"My ruling on the issue is that it is so far afield from the issues at the trial of this matter and is not related to the credibility of the witness in questionbeing Deljuane Mitchellthat I am going to disallow the evidence."
Louisiana Code of Evidence Articles 403, 607(D)(2) and 608(B) provide as follows:
Article 403:
"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading *790 the jury, or by considerations of undue delay, or waste of time."
Article 607(D)(2):
* * * * * *
"D. Attacking credibility extrinsically.

Except as otherwise provided by legislation:
* * * * * *
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice." (emphasis added)
Article 608(B):
* * * * * *
"B. Particular acts, vices, or courses of conduct.

Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required." (emphasis added)
In the instant case, the sole purpose of Mrs. Mayho's testimony was to show that Deljuane Mitchell lied about not threatening her. This testimony is clearly prohibited by Article 608(B). In addition, the trial court found that allowing such testimony would be "irrelevant to the trial of these particular issues, which is a second degree murder trial ... [and] would be getting into the actual trial of whether or not statements were made back and forth between the mother of the defendant and the brother of the victim. I think that's so far afield and so irrelevant to the controversy that we have, and that's the issue of guilt or innocence in a second degree murder, that it does not play a significant factor on credibility." We agree and find no error in the trial court's ruling.
This assignment of error is without merit.

ASSIGNMENT OF ERROR 4:
Defendant asserts the State failed to present sufficient evidence to sustain a conviction for second degree murder beyond a reasonable doubt. Specifically, defendant argues the State failed to prove that defendant did not act in self defense or, in the alternative, that the mitigating factors of manslaughter were not proven. We disagree.
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987); State v. Fuller, 414 So.2d 306 (La.1982).
Nevertheless, the reviewing court may not disregard its duty to consider whether the evidence is constitutionally sufficient simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. Mussall, supra. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. Mussall, supra. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, supra.
Defendant was convicted of second degree murder. Second degree murder is:
"The killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm."
*791 Defendant argues that no rational trier of fact could have found the testimony of the State's witnesses credible enough to support a finding that defendant did not act in self defense or in defense of others.
Louisiana Revised Statute 14:20(1) defines a homicide as justifiable:
"A homicide is justifiable:
(1) When committed in self defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger; ..."
In addition, Louisiana Revised Statute 14:21 provides:
"A person who is the aggressor or who brings on a difficulty cannot claim the right of self defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict."
When a defendant asserts justification as a defense to a charge of murder, the State bears the burden of proving beyond a reasonable doubt that the killing was not justified. State v. Rosiere, 488 So.2d 965 (La.1986); State v. Dozier, 553 So.2d 911 (La.App. 4th Cir.1989), writ den. 558 So.2d 568 (La.1990). The question, therefore, for the reviewing Court is not whether a rational fact finder could have found that the State had proved the essential elements of the offense beyond a reasonable doubt. The applicable standard is whether a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicide was not committed in self defense or in defense of others. State v. Matthews, 464 So.2d 298 (La.1985); State v. Dietrich, 567 So.2d 623 (La.App. 1st Cir.1990) writ den. 568 So.2d 1079 (La.1990).
In support of his argument that he shot Marvin Mitchell in self defense, defendant asserts that he was driving away from the house to avoid further confrontation when he noticed Mrs. Taylor walking towards the car. He asserts that he stopped the car only to speak with her. During their conversation, Taylor's children, one of whom defendant presumed was Wilson's violent ex-boyfriend, began running toward him. Defendant insists that he fired in self defense, offering his and Wilson's testimony that Marvin Mitchell was armed. However, all of the State's witnesses testified that the victim was not armed. Wilson admitted that in her first statement to the police she stated that Marvin was not armed. Several witnesses testified they saw defendant emerge from the car with a gun and point it at Mrs. Taylor's head. In addition, Mrs. Taylor testified she saw defendant attach a device with a red light to the top of his gun, aim it at her children and repeat several times, "Keep coming, M.F., keep coming M.F." Corroborating Mrs. Taylor's testimony was that of several other witnesses who stated they saw a red light emanate from defendant's gun and flash across Deljuane and a mailbox before landing on the victim's head seconds before he was shot.
Thus, the jurors weighed the testimony and came to the conclusion that the victim was not armed nor did he threaten the defendant. Viewing the evidence in the light most favorable to the prosecution, a rational fact finder could conclude that defendant did not act in self defense.
In the alternative, defendant asserts the homicide was at most manslaughter, not second degree murder. Defendant points to the testimony that all parties were engaged in a heated argument moments before the shooting; that Ms. Wilson told him of the victim's violent propensities and that defendant fired only in response to five family members charging him with a gun.
Manslaughter (La.R.S. 14:31) is:
"(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's *792 blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Articles 30 or 30.1."
Because "heat of blood" or "sudden passion" are not elements of the crime but rather factors which serve to mitigate the grade of the offense from homicide to manslaughter, the defendant must establish them by a preponderance of the evidence. State v. Lombard, 486 So.2d 106 (La.1986); on remand, 501 So.2d 889 (La. App. 5th Cir.1987), writ den. 506 So.2d 504 (La.1987); State v. Camp, 571 So.2d 195 (La.App. 4th Cir.1990); State v. Silbey, 450 So.2d 710 (La.App. 4th Cir.1984).
Although there was testimony from State witnesses that defendant was angry and cursing Mrs. Taylor when he emerged from his car, both Taylor and Ronald Carter testified that defendant calmly repeated "Keep coming, M.F., keep coming" as he aimed his weapon and fired the fatal shot. In addition, witnesses testified that during the argument in the house, Ms. Wilson repeatedly attempted to entice Marvin to come outside with her. When Mrs. Taylor, becoming suspicious, opened the front door, she observed defendant standing over the roof of his car with a gun pointed toward the house threatening to kill everyone inside.
Given the above facts, a rational trier of fact could very well have found that defendant failed to prove by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" when he shot Marvin Mitchell.
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Code of Evidence Article 702 replaced La.R.S. 15:464 which previously provided:

"On questions involving a knowledge obtained only by means of a special training or experience the opinions of persons having such special knowledge are admissible as expert testimony."